```
             IN THE UNITED STATES DISTRICT COURT FOR
           THE DISTRICT OF MARYLAND, NORTHERN DIVISION

                                   *
THE JOHNS HOPKINS UNIVERSITY
et al.,                            *

      Plaintiffs,                  *

v.                                 *     CIVIL NO.: WDQ-05-cv-759

DATASCOPE CORPORATION              *

      Defendant.                   *

*     *     *     *     *     *     *     *     *     *     *     *     *
```

MEMORANDUM OPINION AND ORDER

The Johns Hopkins University ("JHU") and Arrow International, Inc. ("Arrow") sued Datascope Corporation ("Datascope") for patent infringement.[1] Datascope has counterclaimed alleging invalidity and noninfringement of JHU's patents. Pending is Datascope's motion for summary judgment. For the following reasons Datascope's motion for summary judgment will be denied.

I.   BACKGROUND

JHU is a Maryland non-profit corporation engaged in the business of higher education and medical training. Compl. at ¶¶ 1-2. Arrow is a Pennsylvania corporation engaged in the design, development, manufacture, and sale of medical products. *Id*. at ¶¶ 3-4. Datascope is a Delaware corporation that manufactures products

---

[1] 35 U.S.C. § 271 (2005).

1

for clinical health care. *Id*. at ¶¶ 5-6. JHU is the owner of Patents 5,766,191, "Perucutaneous Mechanical Fragmentation Catheter System" (the "191 patent") and 6,824,551, "Perucutaneous Mechanical Fragmentation Catheter System" (the "551 patent"). *Id*. at ¶¶ 10-11. The 191 patent was issued on June 16, 1998. *Id*. at ¶ 10; attached to Compl. at Ex. 1. The 551 patent was issued on November 30, 2004. *Id*. at ¶ 11; attached to Compl. at Ex. 2.

Both patented catheter systems were invented by Dr. Scott O. Trerotola ("Trerotola"). *Id*. at ¶ 12. The patents claim methods for clearing blood clots from vascular grafts in hemodialysis patients. *Id*. Arrow is the exclusive licensee of the 191 and 551 patents. *Id*. at ¶ 13. Arrow manufactures and sells the "Arrow-Trerotola PTD," which is a device specifically designed for carrying out the methods of the 191 and 551 patents. *Id*. at ¶ 14.

JHU and Arrow allege that Datascope infringed the 191 and 551 patents by offering for sale and selling the Datascope ProLumen Rotational Thrombectomy System (the "ProLumen"), which includes instructions for carrying out methods claimed in the 191 and 551 patents. *Id*. at ¶¶ 16, 22. JHU and Arrow also allege that Datascope has induced others to infringe both patents by sale of the ProLumen. *Id*. at ¶¶ 17, 23.

JHU and Arrow seek: (1) a declaratory judgment that Datascope willfully infringed the patents; (2) injunctive relief enjoining Datascope from infringing the patents; (3) an accounting of all

products used to infringe the patents; (4) damages, including lost profits and interest, and reasonable royalties; (5) treble damages for willful patent violations; (6) pre-judgment and post-judgment interest; (7) attorney's fees and costs; and (8) any other relief the Court deems appropriate.

II. Analysis

A.   Datascope's Motion for Summary Judgment

Datascope has moved for summary judgment arguing that every asserted claim of the 191 and 551 patents requires a member which expands to conform to the shape and diameter of the blood vessel into which the member is inserted. Mot. Summ. J. at 1. Datascope argues that Arrow[2] has repeatedly represented and argued that its invention involves a three-dimensional "cage" or "basket" that compresses to conform to the diameter of the blood vessel and the shape of the inner lumen.[3] Id. at 1-2.  The ProLumen employs a "S-Wave wire" device that does not expand to conform to the shape of a blood vessel; however, the ProLumen does expand to conform to the diameter of the inner lumen.  Id. at 1, 25-26; Reply at 9. Datascope argues that there has been no literal infringement of the

---

[2] Datascope refers to JHU and Arrow collectively as "Arrow" in its motion for summary judgment.

[3] The parties do not define the term "lumen" but the Court understands the lumen to be the passage within a tubular organ. See Webster's New World Dictionary 804 (3d ed. 1988).

3

patents by the ProLumen nor infringement under the doctrine of equivalents.

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask... whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Id.* at 252.

The court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Electric Industrial Company v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the opponent must produce evidence upon which a reasonable fact finder could rely.  *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  A mere "scintilla" of evidence will not preclude summary judgment.  *Anderson*, 477 U.S. at 252.

Summary judgment may be appropriate in literal patent infringement cases or claims under the doctrine of equivalents.

*Gart v. Logitech, Inc*., 254 F.3d 1334, 1339 (Fed. Cir. 2001); *Desper Prods. V. Qsound Lab*., 157 F.3d 1325, 1332 (Fed. Cir. 1998).

1.   Literal Claim Infringement

Determining literal infringement requires: (1) proper construction of the claim to determine its scope and meaning; and (2) comparison of the claim as properly construed to the accused device or process.  *PC Connector Solutions LLC v. Smartdisk Corporation*, 406 F.3d 1359, 1362 (Fed. Cir. 2005); *Georgia-Pacific Corporation v. United States Gypsum Co.*, 195 F.3d 1322, 1330 (Fed. Cir. 1999); *Markman v. Westview Instruments*, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995)(en banc), *aff'd*, 517 U.S. 370 (1996); *Hemphill v. Proctor & Gamble Co.*, 258 F. Supp. 2d 410, 415 (D. Md. 2003).

When construing a claim, a court should look to intrinsic evidence, i.e., the patent itself, the claims themselves, the written description of the specification, and the prosecution history.  *Hemphill*, 258 F. Supp. 2d at 415; *Georgia-Pacific*, 195 F.3d at 1332.  When intrinsic evidence is ambiguous, the court may rely on extrinsic evidence to determine the meaning of the claims. *Georgia-Pacific*, 195 F.3d at 1332.  The parties agree that the claim interpretation issue presented by Datascope - whether the asserted claims require a basket or cage - only requires consideration of intrinsic evidence.  *See* Mot. Summ. J. at 24; Opp. at 9.

5

(a)   The Patent Abstracts

Both the 191 and 551 patents contain the same abstract which states:

> A percutaneous thrombolytic device, also referred to herein as a percutaneous mechanical fragmentation catheter system, that includes a wire cage or basket attached to a rotational drive motor.  The fragmentation basket, ensheathed in an outer catheter, is introduced into the clotted graft or vessel via an introducer sheath.  When deployed, the basket will automatically conform to the inner dimensions of the vessel lumen.  The rotating basket is slowly withdrawn through the clotted graft, mechanically fragmenting the clot.  The fragmented, homogenized debris can be flushed into the venous system or aspirated.  *See* Compl. Ex. 1-2.

(b)   The Specifications

The content of the specifications and drawings for the 191 and 551 patents are the same, other than paragraph numbering that slightly differs.


(i) Background of the Invention

The background description of the invention explains that the invention relates to the catheter for mechanically fragmenting clots within the vascular system.  The catheter is used percutaneously (introduced through the skin), which prevents invasive surgical procedures.  While other inventions have developed techniques to break up clots and remove plaque, these devices have required a larger sheath and have a limited channel size.  "Moreover, the prior art devices do not automatically accommodate to changes in the inner

lumen dimensions of the graft or vessel caused by the presence of a thrombus or automatically expand outward toward the vessel or conduit walls as the thrombus is being fragmented." *See* Background Information, col. 1.

Treretola contrasts his inventions with prior art, such as Patent No. 5,030,201 issued to Aubrey Palestrant, where expansion of the device is controlled by the operator and the device cannot automatically compensate for changes in the inner lumen as obstructing material is removed. *Id*. at col. 2. Treretola proceeds to describe various mechanical devices that use "ureteric stone catcher baskets mounted on a catheter tip to grab and remove thrombotic material" instead of rotating members to cut the obstructive material; however, these devices do not automatically expand the mechanical fragmentor to accommodate the inner lumen as does Treretola's invention. *Id*.

(ii) Summary of the Invention

The summary of the invention provides a concise description of Treretola's new approach to fragmenting clots within the vascular system, in particular within synthetic vascular grafts. Treretola's invention overcomes deficiencies in the prior art by:

> (1) automatically expanding to conform to the inner lumen dimensions and shape; (2) applying a radial pressure so that the fragmentor automatically expands as the thrombus is fragmented and can eventually press against the walls of the conduit; and (3) using a minimal number and size of

7

> components so that the catheter can be deployed through a small introducer sheath. *Id*. at col. 2.

The summary of the invention also explains that the device is comprised of a "stone retrieval basket modified to attach to a rotational drive motor." *Id*. The catheter is introduced into the clotted graft via a sheath.

> When deployed, the basket will automatically conform to the inner dimensions of the vessel lumen. The rotating basket is slowly withdrawn through the clotted graft, mechanically fragmenting the clot....The wire cage that makes up the basket contains a designed "springiness" enabling it to self-expand. Thus, the cage can conform to the inner lumen dimensions and shape and apply radial pressure against the thrombus material, thereby expanding to homogenize substantially the entire cross-section of the conduit. As the material homogenizes, the cage automatically expands. *Id*. at col. 2-3.

The advantage to Treretola's invention is that use of the device does not require surgery. The procedure time is also shortened and costs and risks are decreased.


(iii) Detailed Description

The detailed description of the "percutaneous thrombolytic device (PTD)" provides a lengthy discussion of how the PTD is made, operates and functions, consistent with the technical drawings included in the patents. *Id*. at col. 4. Throughout the detailed description, references are made to the "fragmentation basket or cage" which is designated as 18 in Figure 1. The basket or cage is made from three to six wires, shown as 26 in Figure 2. The basket

or cage can be compressed, because the wires are flexible, so that its outer diameter is reduced and conforms to the inner diameter of the vascular conduit, as well as press against the inner lumen of the vascular conduit and conform to its size and shape. *Id*. at col. 4

(c)  The Claims

The main difference between the 191 and 551 patents is that 191 consists of seven claims, while 551 has 39 claims.  In Arrow's response to Datascope's discovery requests,[4] Arrow contends that the ProLumen infringes on claims 1, 4, and 5 of the 191 patent.  *See* Arrow's Interrogatory Response No. 3 attached at Mot. Summ. J. Ex. C.  Arrow also contends that the ProLumen infringes on claims 16-20 of the 551 patent, as well as claims 21-34 and 37-39, as these claims depend from claims 16 and 19 of the 551 patent.  *Id*.

Dependent claims cannot be infringed unless the claims on which they depend are found to be infringed. *Minnesota Min. & Mfg. Co. v. Chemque, Inc*., 303 F.3d 1294, 1299 (Fed. Cir. 2002); *Wolverine World Wide, Inc., v. Nike, Inc.,* 38 F.3d 1192, 1199 (Fed. Cir. 1994); *Wahpeton Canvas Co. v. Frontier, Inc.,* 870 F.2d 1546, 1553 (Fed. Cir. 1989).  Absent evidence that Datascope infringed claims 1 and

---

[4] Arrow's response to Datascope's interrogatories are identical to the responses provided by JHU; thus, reference is only made to Arrow's responses.

9

5 of the 191 patent and claims 16 and 19 of the 551 patent, Datascope cannot be found to have infringed claim 4 of the 191 patent and claims 21-34 and 37-39 of the 551 patent.

The pertinent language from the independent claims of both the 191 and 551 patents is that the method for fragmenting thrombotic material in a vascular conduit involves the fragmentation member automatically expanding "to conform to the shape and diameter of the inner lumen of the vascular conduit." *See* Comp. Ex. 1 at col. 8; Ex. 2 at col. 9-10.  None of the independent claims at issue references a basket or cage, but some of the dependent claims specifically state that the fragmentation member comprises a wire basket. *See* claims 2-3 and 6-7 of the 191 patent and claims 3, 10-11, 17, 20, 35-39.  The dependent claims Arrow identified in its interrogatory responses as causing infringement relate to the rotation of the fragmentation member, the speed of rotation, identification of the fragmentation member as made of memory wire, and the attachment of a handle to the end of the fragmentation catheter for deploying the fragmentation member.

(d)   The Prosecution History

JHU and Trerotola have a prosecution history from 1992 to 2004, consisting of seven different applications, appeals, amendments, and the issuance of the 191 and 551 patents.  Without analyzing in detail the 12 years of arguments and appeals filed on behalf of the

10

Trerotola invention, the Court notes that the independent claims consistently referred to a fragmented member that "automatically expands to conform to the shape and size of the inner lumen." Mot. Summ. Jud. at 11-14.  By September 2004, the Patent and Trademark Office ("PTO") Examiner allowed claims on the basis that prior art did not suggest, as Treretola's invention does suggest, a member that "automatically expands to conform to the shape and diameter of the conduit."  *Id*. at 20.

The prosecution history also evidenced statements of Treretola's invention, which described the inventive device as a "motor-driven self-expandable basket," a "stone retrieval basket," and a "wire basket."  *Id*. at 13-14.


   2.   Construction of the Claim

Based upon the intrinsic evidence, Datascope contends that Arrow's asserted claims require that "the catheter member 'expands to conform to the shape and diameter of the inner lumen' of a blood vessel or other 'conduit' [and] requires a three-dimensional cage or basket which expands to fill substantially the entire inner lumen." *Id*. at 24.  Arrow argues that Datascope has added a limitation - the requirement of a basket or cage - that is not necessary to determining the only claim issue, which is the meaning of the term "shape."  Opp. at 8-9.

  Both parties agree that the term "shape" should be given its

11

ordinary meaning; however, Datascope argues that to understand how the claims in the patents conform to the "shape" of the inner lumen requires construing the claim in conjunction with the intrinsic evidence that repeatedly refers to the member as a basket or cage that when compressed, conforms to the shape of the inner lumen. Mot. Summ. J. at 25-26.  Arrow adopts the narrower position that the claim language to be interpreted only requires an understanding that the shape is three-dimensional and the fragmentation member conforms to the shape of the vascular conduit, whether the conduit is curved or straight.  Opp. at 11.  In other words, is the claim construction the ordinary meaning of shape as argued by Arrow, or the ordinary meaning plus a basket or cage as argued by Datascope?  Based upon the ordinary meaning alone, there is a genuine dispute of a material fact, because the parties disagree whether the ProLumen conforms to the shape of the graft.

Arrow argues that the ProLumen S-wave wire conforms to the shape of the graft, because it can bend and maneuver in a U-shaped graft.  Opp. at 2-24.  Datascope argues that the S-wave wire does not conform to the shape of the lumen, because the device retains its S-wave shape.  Reply at 3.  Although the ProLumen may bend in a particular direction, the device retains its S-wave shape.  *Id*.  Without considering whether the claim construction should include references to a basket or cage, the parties disagree on the shape of the S-wave wire, which presents a genuine dispute of a material fact

precluding summary judgment.

## CONCLUSION

For the reasons discussed above, Datascope's motion for summary judgment will be denied.

<u>January 18, 2006</u>                              <u>        /s/              </u>

Date                                       William D. Quarles, Jr.
                                           United States District Judge

13